IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA for the use and benefit of COUNTRYSIDE INDUSTRIES, INC., an Illinois Corporation,<br><br>Plaintiff,<br><br>v.<br><br>INTEGRATED CONSTRUCTION TECHNOLOGY CORPORATION, MOTA CONSTRUCTION COMPANY, INTEGRATED/MOTA JOINT VENTURE, SAFECO INSURANCE CO. OF AMERICA, and CONTINENTAL CASUALTY CO.,<br><br>Defendants. | Case No. 07 CV 2633<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff Countryside Industries, Inc. ("Countryside") has brought this action against Defendants Integrated Construction Technology Corporation ("Integrated"), Mota Construction Company ("Mota"), Integrated/Mota Joint Venture ("IMJV"), Safeco Insurance Co. of America ("Safeco"), and Continental Casualty Co. ("Continental") to enforce rights under the Miller Act. 40 U.S.C.A. § 3131. Invoking the court's supplemental jurisdiction, Countryside also asserts a breach of contract claim against Integrated, Mota, and IMJV, or, in the alternative, a *quantum meruit* and unjust enrichment claim against these same parties. Before this Court is Defendants' Motion to Stay Pending Mediation. Because Defendants have not demonstrated the existence of an agreement to mediate, the Motion is denied.

1

**Factual Background**

In early 2005, the United States Department of the Navy awarded IMJV, a joint venture between Integrated and Mota, a contract to make various improvements to the Great Lakes Naval Station in Great Lakes, Illinois (the "Naval Station"). (Pl.'s Cplt. ¶ 9.) In accordance with the provisions of the Miller Act,[1] IMJV secured bonds from Safeco and Continental for the project. *Id.* at ¶ 10. IMJV also solicited bids from commercial landscaping companies to supply the various landscaping materials and services that would be required. *Id.* at ¶ 11.

On June 29, 2005, Countryside submitted a bid to IMJV for certain landscaping work at the Naval Station. (Gabler Decl. at ¶ 3, attached as Exh. 1 to Pltf.'s Opposition to Mtn. to Stay.) In response to a request from IMJV, Countryside submitted a new bid on July 1, 2005. IMJV responded to the new bid with a Letter of Intent dated July 13, 2005 (the "July 13 Letter") that notified Countryside of IMJV's intent to enter into a subcontract with the firm for certain landscaping work at the Naval Station. The July 13 Letter stated that it was "solely a Letter of Intent of award of a contract to your firm, and not a contract as such." (July 13 Letter, Exh. C to Gabler Decl.) The July 13 Letter further advised that "[t]here is no obligation on the part of Integrated/Mota J.V. unless a subcontract agreement is signed by both parties." *Id.*

Countryside began work on the landscaping work at the Naval Station on July 18, 2005. (Eichhorn Decl. at ¶ 2, attached as Exh. A to Def.'s Reply.) Subsequently, on July 25, 2005, IMJV sent its proposed version of the subcontract agreement (the "Subcontract Agreement") to

---

[1] Section 3131 of the Miller Act requires that before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government a performance bond and a payment bond, for the protection of all persons supplying labor and material in carrying out the work provided for in the contract. *See* 40 U.S.C. § 3131.

Countryside. *Id.* at ¶ 3. Countryside received the Subcontract Agreement approximately one week later – on or about August 1, 2005. (Gabler Decl. ¶ 6.)

Upon review, Countryside determined that several aspects of the Subcontract Agreement did not accurately reflect the terms of the bid it had submitted to IMJV. *Id.* Accordingly, Countryside did not sign and return the Subcontract Agreement; instead, Countryside modified the subcontract to indicate, among other things, that the turf that Countryside was to provide to IMJV would not be covered under warranty. *Id.* at ¶ 7. Edward Gabler, Countryside's Vice President of Operations, initialed each change that Countryside made to the Subcontract Agreement. *Id.* at ¶ 6. In a letter dated August 17, 2005, Countryside itemized these changes and stated that: "[t]he following changes/additions need to be accepted by you prior to execution & return of contract. Please indicate your acceptance and fax back. . . so that we may attach these changes to the contract." (Exh. D to Gabler Decl.) On August 22, 2005, Countryside sent this letter and the revised pages of the Subcontract Agreement to IMJV via Federal Express. (Pl.'s Compl. at ¶ 15 and Exh. A thereto; Gabler Decl. at ¶ 7.) IMJV did not return a signed copy of the modified contract to Countryside. For its part, IMJV maintains that it has no record of ever having received Countryside's proposed modifications. (Eichhorn Aff. at ¶ 4.)

During the course of roughly the next year, IMJV executed and delivered to Countryside seven separate change orders calling for work outside the original scope of the project. (Cplt. at ¶ 18; Pl.'s Resp. in Opp'n to Def.'s Mot. to Stay at Ex. 3). As of September, 1 2006, Countryside contends that IMJV was in default for failure to pay invoices when due and refused to process the necessary paperwork for change orders relating to extra work that IMJV had previously authorized and that Countryside had completed. (Cplt. at ¶ 22).

3

In early September of 2006, a dispute arose between the Navy and IMJV regarding IMJV's obligations under its contract with the Navy. (Pl.'s Compl. at ¶ 23.) In particular, the Navy demanded that IMJV provide sod at certain locations at the Great Lakes Naval Station as opposed to the less expensive hydroseeding that Countryside had already delivered and installed. *Id.* IMJV asked Countryside to submit a proposal for the delivery and installation of sod. *Id.* at ¶ 24. Countryside advised IMJV that it would not submit any proposals for additional work until IMJV cured its payment defaults and processed the necessary paperwork with respect to the change order work that Countryside had already performed. *Id.*

In a letter to Countryside, dated September 5, 2006, IMJV stated that the Navy had not accepted the condition of the turf that Countryside had installed and additionally that Countryside had refused to remedy this "unacceptable" turf. *Id.* at ¶ 25. On September 6, 2006, Countryside notified IMJV, Integrated, and Mota of its claims and the amount owed for work on the project. *Id.* at ¶ 29. Countryside also provided written notice to Safeco and Continental detailing its claim and the money it believed IMJV owed to the firm as a result of its prior work. *Id.* at ¶ 30. Neither Safeco or Continental paid any portion of Countryside's claim. *Id.* at ¶ 42.

On May 9, 2007, Countryside filed the this action seeking damages under: (1) the Miller Act; (2) for breach of contract; and (3) under a *quantum meruit* / unjust enrichment theory. On June 19, 2007, the Defendants filed a Motion to Stay Pending Mediation. In support of their motion, Defendants point to the Subcontract Agreement, which agreement contains a mediation provision requiring that:

> Any controversy except those covered by the insurance required herein, arising out of or relating to this Agreement or the breach thereof shall be subject to mediation before any other legal proceedings can be initiated. . . . Any mediation shall include

> at the discretion of INTEGRATED/MOTA JOINT VENTURE, the Owner, any other applicable subcontractor, or any other party.

(Def.'s Mtn. to Stay, Exh. A thereto at ¶ 10.7.) Defendants argue that this case arises out of or relates to the Subcontract Agreement and, as such, this dispute must be mediated before litigation can proceed.

## Discussion

A threshold issue in this case is whether there exists an agreement to mediate before legal proceedings may be initiated. When determining whether the parties have agreed to mediate a certain matter, courts should apply ordinary state law principles that govern the formation of contracts. *First Options v. Kaplan*, 514 U.S. 938, 944 (1995). Where the facts are not in dispute, the existence of a contract is a question of law for the court to decide. *Reese v. Forsythe Mergers Group*, 288 Ill. App. 3d 972, 979 (2nd Dist. 1997) (citing *Lewis-Connelly v. Bd. of Educ.*, 277 Ill. App. 3d 554, 557 (2nd Dist. 1996).[2]

---

[2] The parties appear to have concluded that Illinois law applies to this dispute. The Court finds no reason to quarrel with that conclusion. The Subcontract Agreement contains a choice-of-law provision providing that the Subcontract Agreement is to be governed by the law in effect in the place of the project – in this case, Illinois. If the Court were to find the Subcontract Agreement valid, that provision would be given effect. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 844 (7th Cir. 1994). In the absence of a valid and enforceable choice-of-law provision, Illinois choice-of law rules would still require application of Illinois substantive law in this case. "Illinois has adopted the 'most significant contacts' test proffered by the Restatement (Second) of Conflicts § 188 (1971) in deciding choice-of-law disputes with respect to contractual issues." *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). "According to the test, five factors are relevant in making choice of law determinations: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and place of business of the parties." *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995). In this place, all of the parties save Safeco are Illinois corporations and all of the parties have places of business in Illinois. The Court therefore assumes that the place of contracting and negotiation are both in Illinois as well. The place of performance is in Illinois as is the subject matter of the Subcontract Agreement. Accordingly, under either the Subcontract Agreement's choice-of-law provision or the "most significant contacts" test, Illinois law applies to this dispute.

Under Illinois law, it is axiomatic that contract formation requires an offer, acceptance of that offer, and consideration. *Chicago Limousine Serv. v. City of Chicago*, 335 Ill. App. 3d 489, 494 (Ill. App. Ct. 2003). An offer does not ripen into a contract until it is accepted. *Moore v. Lewis*, 51 Ill. App. 3d 388, 392 (Ill. App. Ct. 1977). An acceptance must conform strictly to an offer; an acceptance requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed. *Finnin v. Bob Lindsay, Inc.*, 366 Ill. App. 3d 546, 548 (Ill. App. Ct. 2006) (citing *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993)). "The language of an offer may moreover govern the mode of acceptance required, and, where an offer requires a written acceptance, no other mode may be used." *LaSalle Nat'l Bank v. Vega*, 167 Ill. App. 3d 154, 161 (Ill. App. Ct. 1988) (citing *Zeller v. First Nat'l Bank & Trust Co.*, 79 Ill. App. 3d 170, 172 (Ill. App. Ct. 1979)).

In this case, the Subcontract Agreement that IMJV sent to Countryside constituted an offer. Before IMJV sent the Subcontract Agreement to Countryside, it sent a letter of intent advising that there would be no obligation on the part of IMJV – that is, there would be no contract – until a subcontract agreement was *signed* by both parties. Upon receipt of the offer from IMJV, Countryside did not sign the agreement and return it to IMJV. Instead, Countryside made several changes to the draft agreement, including an indication that turf it was to provide to IMJV would not be covered by any warranty. Countryside sent its proposed changes back to IMJV accompanied by a letter indicating that Countryside required IMJV to accept those changes before it would execute and return the contract. Under Illinois law, Countryside's modifications to IMJV's draft subcontract agreement constituted a rejection of IMJV's offer and simultaneously created a

6

counteroffer.  *Finnin*, 366 Ill. App. 3d at 548.  Because IMJV never accepted that counteroffer, no contract was formed between the parties.

That IMJV maintains that it never received Countryside's modifications to the Subcontract Agreement does not affect the Court's conclusion that no contract was formed between the parties. IMJV's offer required Countryside to manifest its acceptance by signing the Subcontract Agreement and its letter of intent advised that no contract would be formed unless a subcontract agreement were to be signed by both parties.  Though the parties have submitted affidavits and exhibits regarding their negotiations with respect to the Subcontract Agreement, neither party has submitted any evidence of any agreement signed by even one party, let alone an agreement signed by both parties. As such, this Court finds that neither the Subcontract Agreement nor Countryside's modified agreement resulted in a valid contract.  *Chicago Title & Trust Company v. Ceco Corp.*, 415 N.E.2d 668, 677 (Ill. App. Ct. 1980) ("[I]f the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery").  *A fortiori*, Defendants have failed to demonstrate the existence of an agreement to mediate any disputes between them arising out of the Subcontract Agreement before initiating litigation.  Accordingly, the Defendants' Motion to Stay Pending Mediation must be denied.

So ordered.

_Virginia M. Kendall_
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: September 28, 2007